Good morning, Your Honor. Thomas Jacobs appearing on behalf of the appellant in this matter, Jesus Castro-Delfin. May I proceed? Your Honor, with respect to today's argument, in the limited time we have, there are approximately four major issues that I believe the Court should be looking at. First of all, does the fact that the Nesamian test applied in this case, or put differently, does the Nesamian case applied in this case, show that the defendant was the declarant or that the interpreter was the declarant? Thirdly, does the fact that Agent Lopez testified in this case essentially moot the issue and set aside any concerns about the Confrontation Clause? And lastly, did the District Court err in applying the two-level enhancement with regard to special skill? With regard to the Nesamian issue, and to hit that squarely, the government takes the position that Nesamian is binding on this panel, and previous decisions of this Court have indicated that until further instruction from the Supreme Court is available, the Nesamian test, which is a four-part test to determine who the declarant is in this situation, applies. With regard to the question of Nesamian, the decision in Crawford that the U.S. Supreme Court made, made it very clear that the Supreme Court's present concern with regard to the Confrontation Clause is that these courts not apply tests of reliability like we do in hearsay in determining whether or not to admit a statement that is essentially one that is made out of court without an opportunity for fair cross-examination. But Lopez testified. Lopez testified, but the problem with Lopez's testimony was that if we were to accept that as valid, in other words, as mooting the issue, essentially the government would have an end run about everything that the framers wanted to contemplate. Well, they were able to summon them, I mean, they were able to get him to appear for testimony, for trial. Sometimes the officers, you know, they travel around the United States, and they're not always in the same location, and they're not available, and then you might have a good Confrontation Clause argument. But he was here, he testified. What you were able to cross-examine him regarding what he did and what questions he asked. We know that he asked his own questions. We know that he participated in the interview. I don't understand why that's a confrontation problem. Here's the problem. First of all, notably, the government wasn't even initially going to call Lopez, but then they decided to. Because he did. He was there, he testified. Correct. What he testified to was that he did interpretation for the interview, he participated in it, he made no notes, he made no report, he had no recollection, and this is particularly important. They're not allowed to record those. That's a different – that might go to his credibility. I don't see how that goes to his – to a Sixth Amendment confrontation. And with respect, Your Honor, it's not a credibility issue, because he didn't even go to review the report that was admitted, and he didn't review the notes that were taken. If we were to look at this under a Nazanian sort of a reliability issue, or even under the Crawford standard, there is no reason why this statement should have been admitted from a witness who did not recall what occurred. This is a tantamount to bringing a witness into court and saying what happened and the witness saying, I don't know, and saying, well, you previously gave a statement. I may have given a statement, but I don't know. There was no exception to admit that statement in that fashion. I think you have a hard argument on the Sixth Amendment issue. I mean, the Nazanian test, the first prong, he was supplied by the – what was it? He was employed by the government, correct? If we were to go through the Nazanian test. And the big problem here is he acted as an interrogator. He just didn't act in the role of a translator. Correct. He was an interrogator. And under the Nazanian test, it is very clear that this was not the defendant's agent. This was an agent interrogating the defendant. If we went through all four of the factors, we would find that he was provided by the government, that he was actually actively interrogating the defendant. And even if, as the government suggests, the central two factors could go either way, the fourth factor, which the government claims, which is the action subsequent to the statement, if you look at the reply on pages 12 and 13, there is a whole list of things that were inconsistent. The defendant denied making those statements, said he was misinterpreted. There is nothing in there that – where the defendant validated what the interpreter said, which is really the kind of subsequent action that they are looking for. So this was not the statement of the defendant. This was the statement of the interpreter. The interpreter was an active agent. An active agent who prepared no reports, kept no notes, had no recollection. There is no opportunity for meaningful cross-examination. And this is Owen, and this is talking about the concerns that Brennan and Marshall had, but also concerns that were raised later. There is no opportunity for any meaningful cross-examination that would assist a trier of fact in determining credibility or determining reliability of that statement because there are no details available from the person who made it, none. It shouldn't have come in for that reason. Roberts. I mean, doesn't that suggest a lack of credibility when he didn't record down what he asked and the answers? There is really no basis for a trier of fact, Your Honor, to come to a conclusion that there is a lack of credibility, because the government proposed, well, here's a reliable agent who is sitting here writing everything down, which would have been fine if you had looked at things like – if you look at Orenhage, there is an example in Orenhage where they are gathering marijuana plants, and it was on the issue of whether the numbers they had admitted should have been admitted. Those agents who went through the field and checked for the marijuana plants, counted marijuana plants, watched the agent write down what the number they gave him as to what they were recording, what they wanted him to record. They verified it. I think you have a pretty good argument on the Nazarian test. But the other problem that I have, though, is that, you know, the government had a pretty strong case here. Harmless error. If we are talking about harmless error, it absolutely wasn't. And the reason is this. The defendant denied making the statement with regard to the first statement he made to Monaghan. But he had a lot of other post-those statements. Subsequent. The jail conversations are very compelling. I wasn't really happy with those. But, Your Honor, frankly, with regard to the – They were very, very – There were essentially three things he did. He gave a statement to Monaghan and Lopez. He gave a statement to the customs officer. And he gave some statements to people over the phone. With regard to the statement to Lopez and Monaghan, he denied that he had said anything incriminating. And subsequently, when he gave a statement in writing to them, his written statement contradicted what he had told them, contained details that he did not tell them, and basically said he had been threatened and he begged off. When he makes a statement to customs, he vehemently denied that he had told the customs officer that he had done this before, that he had done this in exchange for money. He denied all that when he testified. And then when he makes calls from the jail, the supposition from the fact that he testified that he was threatened is that if he was talking to the people who supposedly set him up, which was his position in this matter, that they must have loaded the truck at his place of business, it makes sense and it made sense to the trier of fact, and we argued as best we could that issue because he didn't want to comment on those jail calls at all. He made no comment. But it would make sense that he wouldn't want to get himself in deeper and place his family at risk. So as far as arguments to be made and the weight of the evidence, yes, the government had a number of statements he made, but all of it, all of it was explainable. That very first statement was the most damaging in the sense that that was the very first time he talked to the agents and allegedly told them that he had been paid extra money to do these deals, that he was getting money from his employer and he would get extra money when he would drive loads across that he suspected had drugs. So his statements that he made on the phone, you know, that they recorded at the jail, they were admitted into evidence. Those were admitted into evidence. Yes. Yes. Where he said, he told them, don't worry, I'm not going to snitch on anybody, I'm going to take it on myself. Tell them I didn't snitch on anyone. This problem is only mine. Everything is just mine. And also if I can go see Ricardo to ask him to send the $500, tell him that. I mean. Entirely consistent with someone who's trying to not irritate the people who apparently set him up for a drug transfer, if that's what happened. And one of the agents testified, in fact, that if you were going to set somebody up, and this was their for sale expert, if, if you were going to set somebody up for a blind mule transfer, a commercial trucker is the perfect guy to use because you can hide that stuff anywhere in the truck and he's not going to know it's there and he's going to be going where you tell him and he's going to make short runs as in this case, he's going to make his drop and you have total control over everything. So that was the concern that we had with regard to that. I want to move because I think I'm pretty short on time. I want to move briefly to the two-level enhancement because I think that that is a real problem. The problem with the two-level enhancement that was applied for special skills is that it ignores the two factors that the Court's really supposed to emphasize. One, the difficulty with which the skill was acquired, and there is no evidence that this skill was difficult to acquire, and that's United States v. Lee. And also whether it is more than the offense requiring a special skill to accomplish as opposed to somebody who actually was possessed of an extreme special skill, and that is United States v. Green. Both of those decisions from this Court say that the district court misapplied the two-level enhancement and it mattered. It mattered in this case because the district court, although saying the district court gave a variance in this case, if you look at the case law, it is required that under Mendoza, where we previously found a trucker to have a special skill, that trucker was found to have had a long history of accident-free conduct and there was a record on that, and that's what the Court relied on. But if we go by the standards that we're supposed to accept in this case, there was no evidence that this was a difficult skill to acquire. I think the defendant said that he acquired the skill when he was 14. Ginsburg. Don't you have to have a license to be a commercial truck driver? The licensing. Some sort of test. The licensing in this country is fairly rigorous in terms of the other. I think we made a note it was a nine or ten-week school, which compared to doctors, lawyers, architects, pilots, all the things that the guidelines list as being applicable for that two-level enhancement, it's nothing. I mean, we don't get law degrees. We don't get doctor's degrees. We don't get architect's certifications in nine to ten weeks of trucking school. It's not a difficult skill to acquire. The Mendoza case was one where they had somebody who was trucking large amounts of stuff, and they felt that he had a long history of trucking, no accidents. This guy's driving a truck that got damaged because apparently somebody's messed up, either him or someone else messed up in hooking it up and smashed the rear differential. So can I ask whether there was any record on his history of driving this commercial truck? There was none other than his statement that he'd been driving since he was 14. But the acquisition of the skill and how difficult it was to acquire is what Lee tells us we should be looking at. And keep in mind that the issue about whether the trucking skill was required to commit the offense is not the only inquiry. The emphasis is on more than it just required a trucking skill. This actually minimally required a trucking skill. This could have been done in a car. It just happens that a truck was being used. Because this was like 17 kilos or 14 kilos of methamphetamine, it could have been put in the trunk of a car, in a tire of a car, anything like that. He didn't need a trucker to do it. They were just using the trucker because of the pattern of crossing and because of the opportunity to drop the vehicle at a warehouse, have it unloaded and bring it back, possibly because they didn't want the driver to know what he was carrying. But it had nothing to do with his skill at driving a truck. And that's the concern in this case, is that the district court misapplied that. With permission, I'll save the rest of my time. You're out of time. Am I out? I thought I was over. Thank you very much. I'm not sure what this clock is telling me. Thank you. Okay. It's running down. All right. Over. Please, the court. Ryan Ellersick for the United States. We're asking the court to affirm the conviction and judgment in this case because the district court properly exercised its discretion in applying this court's precedent from Nazemian. And what I don't want to have get lost in this discussion is the standard of review in this case. I think the district court's determination under Nazemian is ultimately reviewed for an abuse of discretion, but the factual findings on each factor is reviewed for clear error. And so, even though in hindsight, there may be, reasonable minds may be able to the record is definitely supported that the district court's findings were not illogical or implausible or without support in the inferences. And specifically, looking at, I think the factor that Mr. Jacobs has raised is that, and we acknowledge that the first factor under that test did weigh slightly in favor of the defense. Slightly? Doesn't it tip substantially in favor of the defendant? There's no question that the officer, what was his name? Lopez. Lopez, that he testified. I mean, he fesses up that he. He did. He asked questions on his own. Yeah, and the other thing, so he's a government agent and not particularly trained as an interpreter. In fact, no training as an interpreter. So, how can we fairly say that the words are those of the defendant here when we have a government agent not only interpreting but also interrogating? It seems a little across the line. Well, what I would say to that, Your Honor, a couple of responses. One, I think that's why we acknowledge that the first factor does weigh in favor of the defense, because he did ask some of his own questions. And he did fess up to that. And that was, the district court was aware of that in making its findings. But I think the bigger question is on the second part of the test, whether that means that because he was asking questions, does that mean he had a motive to mislead or distort? And I don't think that that's a proposition that just because a law enforcement officer is asking questions in an interview, that means that officer has a motive to mislead or distort. And in this case, it's actually interesting because the, I think there would have to be something more to show that there's an actual motive to mislead or distort. And there are a lot of cases where this court has noted that the interpreter was actually like a CI or a co-conspirator. And the court routinely finds there's no motive to mislead or distort with those individuals, which seems to me there's a pretty substantial motive to mislead or distort that we could come up with in those cases. And so just because we have a law enforcement officer asking questions, I don't think that necessarily means he has a motive to mislead or distort the translation. And in fact, in this case, Agent Lopez said he tried his best to provide an accurate translation. And the other thing that's interesting is that this was the, at least in our view, the least incriminating statement that the defendant gave. It was probably the weakest of the government's evidence in this case. As Judge Piaz pointed out, the jail calls were extremely compelling. There was the interview with Officer Mantica, where that's Officer Mantica basically sitting at a computer terminal across from the defendant who speaks fluent Spanish. And he's typing in the defendant's answers, and that's where he admits to having crossed a narcotics on eight or nine previous occasions. So there was much more compelling evidence in the later statements where Agent Lopez was not involved. And so if we are trying to look for some motive to mislead or distort, that original statement would be more incriminating. That the agents would have, he would have distorted it in favor of a suggestion that the defendant knew there were drugs in the car, and that's not what the statement was, it was actually semi-exculpatory, that first statement. And so on that second factor, again, the question is, did the district court clearly err in finding that there was no motive to mislead or distort, and we think that the record does support that finding. Under the third factor, Mr. Jacobs essentially concedes that Agent Lopez spoke good, fluent Spanish, so that's not really an issue. And then you get to the fourth factor, which is the subsequent action, and that's where those other statements do come in, and they're very compelling. They're much more compelling than that first statement. In some ways, when I was looking back at the record in preparation for the hearing, I thought maybe it's almost a stronger case without that first statement, because it removes some area for the defense to kind of exploit and muddy the waters, so to speak. And so the case is extremely strong with those subsequent statements that go beyond being just consistent, they're much more incriminating, and that's what the district court found. And so I think under the standard of review that is deferential, that there was no clear error, and the court properly exercised its discretion. As far as the confrontation issue, we, as the court pointed out, Agent Lopez did testify at trial. So we don't really see this as a Crawford issue as much as an Owens issue. And that's whether the defense had, I suppose, an adequate opportunity to cross-examine Agent Lopez. And I don't think Mr. Jacobs gives himself enough credit. He actually had a very effective cross-examination. He was able to point out that Agent Lopez was not a certified interpreter, that he did not review the HSI agent's notes, that he didn't do his own report, that he actively participated in the interrogation, and that he couldn't remember much about the interview. And as the court pointed out, I'm not sure that goes necessarily to credibility, but it does go to the weight to be given to that statement. And so much so that in the closing argument, the government actually had to more or less concede that it was fair to say that something could have got lost in translation with that first statement. Because Mr. Jacobs did have a good opportunity to cross-examine Agent Lopez, and was able to point out why that statement should not be given very much weight. And we had to acknowledge that, but with the other evidence, as the court said, it was very compelling. And so, under Owens, we think that was more than adequate opportunity to cross-examine. Just briefly on the enhancement issue, with regard to being a commercial truck driver, we made the argument in our brief that really at the end of the day it didn't matter because the guidelines were so high in this case that whether the court applied that enhancement or not, it really didn't matter. And one thing we neglected to point out in the brief is that actually under the sentencing guidelines, section 5G 1.1, it provides that when the statutory maximum does exceed the actual guideline range, or excuse me, when the guideline range exceeds the statutory maximum, that the maximum becomes the guideline range. So in this case, the statutory maximum was 240 months. And with regard to the enhancement, we were talking about without the enhancement, it would have been 292 to 365. With the enhancement, it's 360 to life. And so those were, essentially it didn't matter. And the district court did start at 240 months, and so the district court actually- So it's harmless error because he's going to get the maximum, statutory maximum anyway. I don't even think it's really a harmless error question. It's actually just, did the district court properly calculate the guidelines? And here I think the district court did do that because it started at 240 months, which was in fact the guideline sentence. So there actually was no procedural error in calculating the guidelines, even if the court maybe misapplied that enhancement. The court started at 240. Does the enhancement really apply in this particular circumstance? I mean, only if they just drove the truck across the border. Well, I think reasonable minds could disagree about that, Your Honor. I mean, the record was that he had quite a few years of experience driving a truck. And in his testimony, Mr. Castro's testimony, he said that he had been driving the — there were two trucks for this company, the black truck and the white truck. And he had been driving the black truck until the white truck broke, the differential broke, and that's where the compartment where they put the drugs. And so he took over driving the white truck, and he said because the other driver didn't have as much experience. And he was told to be cautious in driving the white truck, that he could only drive it — he couldn't drive it at high speeds and that sort of thing. And I think there is something in the record where he said when he went to go pick up the trailer before crossing, in this case, that he had to get on the freeway. And so I think there is some evidence that he was — you know, he's driving a truck that has a broken differential that apparently the other driver was not experienced enough to do, but he was. And that's the compartment where they put the drugs. So I think — I think the district court properly applied that enhancement, but at the end of the day, I don't think it really matters because the guidelines are correct. Thank you. All right. Thank you, counsel. U.S. v. Castro-Delphin is submitted. We'll take up Hernandez and Calderon v. City of San Jose.
judges: Noonan, Wardlaw, Paez